18-1578-bk
In re: Stuart Scott Snyder

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2018

(Argued: March 20, 2019                    Decided: September 12, 2019)

Docket No. 18-1578-bk

_____

IN RE: STUART SCOTT SNYDER, DOREEN ANNE SNYDER,

*Debtors.*
_____

JOSEPH J. MURPHY, NANCY MURPHY,

*Plaintiffs-Appellees*,

v.

STUART SCOTT SNYDER, DOREEN ANNE SNYDER,

*Defendants-Appellants*.

_____

Before: POOLER, CHIN, *Circuit Judges*, and VITALIANO, *District Judge*.[1]

Appeal from the United States District Court for the District of Connecticut (Stefan R. Underhill, *C.J.*) affirming an order of the United States Bankruptcy Court for the District of Connecticut (Julie A. Manning, *C.J.*) deeming nondischargeable a prior default judgment entered against Stuart and Doreen Snyder in favor of Joseph and Nancy Murphy in the United States District Court for the Eastern District of New York (the "Eastern District Judgment"). In deeming the debt nondischargeable, the lower courts relied in part on the preclusive effect of the Eastern District Judgment, which arose from a dispute between the families regarding two real estate projects. *See In re Snyder*, No. 15-50553 (JAM), 2017 WL 1839122, at *1 (Bankr. D. Conn. May 5, 2017) ("*Snyder I*"), *aff'd*, 2018 WL 1914923 (D. Conn. Apr. 23, 2018) ("*Snyder II*").

On appeal, the Snyders challenge the use of the Eastern District Judgment to preclude the relitigation of certain facts critical to their defense before the bankruptcy court. While a default judgment generally lacks preclusive effect

---

[1] Judge Eric N. Vitaliano, United States District Court for the Eastern District of New York, sitting by designation.

because the underlying merits of the case are not actually litigated, we hold that where, as here, the default judgment is entered as a sanction, it may be afforded preclusive effect.

The Snyders also argue that the bankruptcy court erred in declaring the Eastern District Judgment nondischargeable pursuant to 11 U.S.C. §§ 523(a)(4) and (6), which prevent the discharge of debts incurred through defalcation, embezzlement, or "willful and malicious injury by the debtor to another entity or to the property of another entity." We conclude that the lower courts erred in treating the Eastern District Judgment as a whole, rather than analyzing each of the two underlying debts for nondischargeability separately.

Affirmed in part, vacated and remanded in part.

_____

SCOTT M. CHARMOY, Charmoy & Charmoy, Fairfield, CT, *for Defendants-Appellants Stuart Scott Snyder and Doreen Anne Snyder*.

MICKEE M. HENNESSY, Westerman Ball Ederer Miller Zucker & Sharfstein, LLP, Uniondale, N.Y., *for Plaintiffs-Appellees Joseph J. Murphy and Nancy Murphy.*

POOLER, *Circuit Judge*:

This appeal arises from an adversary proceeding brought by Joseph and Nancy Murphy seeking to have a prior debt owed to them by debtors Stuart and Doreen Snyder declared nondischargeable as defalcation, willful and malicious injury, and embezzlement. In deeming the debt nondischargeable, the lower courts relied in part on the preclusive effect of a prior default judgment entered against the Snyders on September 23, 2014 in the United States District Court for the Eastern District of New York (the "Eastern District Judgment"). *See In re Snyder*, No. 15-50553 (JAM), 2017 WL 1839122, at *1 (Bankr. D. Conn. May 5, 2017) ("*Snyder I*"), *aff'd*, 2018 WL 1914923 (D. Conn. Apr. 23, 2018) ("*Snyder II*"). The Eastern District Judgment arose from a dispute between the families regarding two real estate projects.

On appeal, the Snyders challenge the use of the Eastern District Judgment to preclude the relitigation of certain facts critical to their defense before the bankruptcy court. While a default judgment generally lacks preclusive effect because the underlying merits of the case are not actually litigated, we hold that

4

where, as here, the default judgment is entered as a sanction, it may be afforded preclusive effect.

The Snyders also argue that the bankruptcy court erred in declaring the Eastern District Judgment nondischargeable pursuant to 11 U.S.C. §§ 523(a)(4) and (6), which prevent the discharge of debts incurred through defalcation, embezzlement, or "willful and malicious injury by the debtor to another entity or to the property of another entity." We conclude that the lower courts erred in treating the Eastern District Judgment as a whole, rather than analyzing each of the two underlying debts for nondischargeability separately.

## BACKGROUND

Plaintiffs-Appellees Joseph and Nancy Murphy are married. Defendants-Appellants Stuart and Doreen Snyder, also married, are Joseph Murphy's brother-in-law and sister, respectively. Joseph Murphy is a retired captain for the New York City Fire Department, and before that he worked as a New York City police officer. The Snyders and Murphys were close, celebrating holidays and vacationing together.

5

Stuart Snyder worked in the custom home building business for more than 20 years. He operated his business through several different entities and trade names, including BBSea Associates, LLC ("BBSea"). Sometime in 2005, Stuart Snyder entered an agreement with Michael Maisel to build three luxury homes in New Jersey (the "New Jersey Project"). The Murphys later entered an oral agreement with the Snyders to become "silent partners" on the New Jersey Project, with the Snyders promising to repay the initial investment and a return of 20 percent. App'x at 126. Pursuant to that agreement, the Murphys wired $100,000 to an attorney trust account in the name of Steven D. Freesman. However, the Murphys were never repaid the $100,000 nor did they receive any return on their investment.

In 2006, the Murphys entered into a second oral agreement with the Snyders to invest $275,000 in a luxury home building project in Greenwich, Connecticut (the "Connecticut Project"). The Snyders promised the Murphys a return of their $275,000, plus at least a 20 percent profit. On August 28, 2006, Joseph Murphy wired $275,000 to a bank account in the name of BBSea, with the understanding that the money would be used to purchase the property needed

6

for the Connecticut Project. Instead, that money was used "for other projects and purposes without notice to or authorization by the" Murphys. App'x at 127. However, the Murphys were never repaid the $275,000 nor did they receive any return on their investment.

In 2010, the Murphys sued the Snyders, along with various other corporate entities allegedly owned or controlled by the Snyders in the United States District Court for the Eastern District of New York, asserting seven claims: (1) breach of contract, (2) conversion, (3) unjust enrichment, (4) fraudulent inducement, (5) money had and received, (6) breach of fiduciary duty, and (7) an accounting.

While an answer to the complaint was filed, none of the defendants responded to discovery requests, prompting the Murphys to move to compel. That motion was granted, with attorneys' fees and costs awarded. Subsequently, the defendants served inadequate responses, and the Murphys again moved to compel. The magistrate judge deemed the responses "woefully deficient," and declared "defendants' conduct to be willful, cavalier, and sanctionable." *Murphy v. Snyder*, No. 10-cv-1513 (JS)(WDW), 2011 WL 4345088, at *1 (E.D.N.Y. July 28,

2011) (internal quotation marks omitted). Defendants were also warned that if their "obstreperous conduct" continued, possible future sanctions including the striking of their answer and the entering of a default judgment, would follow. *Id.* (internal quotation marks omitted). Defendants still failed to comply, and the Murphys moved for sanctions. *Id.* at *2. The magistrate recommended striking the answer, awarding sanctions, and entering default judgment. *Id.* at *3. The district court adopted the report and recommendation in its entirety, and sent the matter back to the magistrate to calculate damages. *Murphy v. Snyder*, No. 10-cv-1513 (JS)(WDW), 2011 WL 4441487 (E.D.N.Y. Sept. 15, 2011).

Shortly thereafter, a new law firm, Ganfer & Shore, LLP, entered an appearance for the Snyders and several of the corporate defendants, and moved to vacate the default judgment. Before that motion was decided, a third firm, Tarter, Krinsky & Drogin LLP, entered an appearance on behalf of the Snyders and the same group of corporate defendants, to replace Ganfer & Shore. The district court granted the motion to vacate the default, conditioned on the defendants' paying the sanctions award.

8

In March 2013, Tarter, Krinsky moved to withdraw, telling the district court it was "unable to communicate with [its] clients and had accrued large sums of outstanding attorneys' fees." App'x at 117. The district court granted the motion on April 9, 2013. During a status conference several days later, the district court gave the corporate defendants 30 days to find new counsel, as "corporations, by law, cannot proceed *pro se*." App'x at 117. The district court advised Stuart Snyder that failure to retain counsel would likely result in entry of default judgment, stating that:

> Mr. Snyder is aware of the ramifications of such motion practice in light of the recent decisions concerning the default judgments previously entered against the defendants in this case. If a default judgment is eventually entered, the Court will not entertain any last minute motion to vacate such default since the Snyder defendants have been put on notice at this time of their obligation to secure counsel for the corporations.

App'x at 117-18.

During a June 2013 status conference, the district court issued a scheduling order that required the parties to serve and respond to document requests and interrogatories by August 8, 2013. The district court stated that:

9

All of the parties were placed on notice today that the Court does not intend to extend any deadline set forth in the accompanying [scheduling order] except for the most extraordinary circumstances. This case is now three years old and discovery is only beginning. Therefore, the Court intends that discovery will move forward expeditiously and be completed in a timely manner as directed by the Court.

App'x at 118 (emphasis omitted). The Murphys served a second set of interrogatories and discovery requests, but defendants failed to respond. The Murphys' counsel sent the Snyders a "good faith letter" requesting compliance with the scheduling order. App'x at 118-19. The Snyders did not respond, did not appear for their scheduled depositions, and did not appear for a district court conference.

In view of the defendants' lack of compliance, the clerk of court issued a certificate of default on October 9, 2013. On October 31, 2013, the Murphys moved to strike the amended answer and for a default judgment pursuant to Federal Rule of Civil Procedure 37. The magistrate judge recommended granting the motion, finding that "[d]efendants have consistently disregarded their discovery obligations as well as multiple Orders of the Court." App'x at 122. The magistrate judge recommended entering a default judgment on the Murphys'

10

claim for breach of contract. As to the remaining claims, the report and recommendation concluded that (1) the conversion, fraudulent inducement, and breach of fiduciary duty claims were "duplicative" of the breach of contract claim, App'x at 128, 134, and (2) the unjust enrichment, money had and received, and accounting claims were barred because of the existence of a valid contract. No objections being made, the district court adopted the report and recommendation in its entirety. The district court entered judgment on September 23, 2014 awarding damages of (1) $120,000 in compensatory damages flowing from the breach of the contract for the New Jersey Project, plus prejudgment interest of $56,515.07; (2) $330,000 in compensatory damages flowing from the breach of the contract for the Connecticut Project, plus $127,913.42 in prejudgment interest; and (3) post-judgment interest and costs of $350.

On April 23, 2015, the Snyders filed for protection from their creditors pursuant to Chapter 11 of the Bankruptcy Code, with the proceedings later converted to a Chapter 7 liquidation. On July 27, 2015, the Murphys commenced an adversary proceeding, seeking a declaration that the Eastern District

11

Judgment was nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) (debt nondischargeable when obtained through false pretenses, false representation, or actual fraud); 523(a)(4) (debt nondischargeable when obtained through "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny"); and 523(a)(6) (debt nondischargeable when obtained through "willful and malicious injury by the debtor to another entity or to the property of another entity."). In August 2016, the Murphys moved for summary judgment, which the Snyders opposed. The bankruptcy court granted the motion with respect to the defalcation, embezzlement, and willful and malicious injury claims brought pursuant to Sections 523(a)(4) and (a)(6), but denied the motion with respect to the false pretenses or actual fraud claim brought pursuant to Section 523(a)(2)(A). *Snyder I*, 2017 WL 1839122, at \*13. The Snyders appealed to the district court, which affirmed the bankruptcy court's ruling as to the defalcation and willful and malicious injury claims, but declined to address the embezzlement claim. *Snyder II*, 2018 WL 1914923, at \*12. This appeal followed.

12

**DISCUSSION**

"In an appeal from a district court's review of a bankruptcy court decision, we review the bankruptcy court decision independently, accepting its factual findings unless clearly erroneous but reviewing its conclusions of law de novo." *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (internal quotation marks and italicization omitted).

## I. Collateral Estoppel

"It is well settled that preclusion principles apply in bankruptcy proceedings," *Evans v. Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006), and that collateral estoppel may be used to establish the nondischargeability of a debt, *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991). A bankruptcy court is required to give a state court default judgment the same preclusive effect as that state's courts would. *See Kelleran v. Andrijevic*, 825 F.2d 692, 694-95 (2d Cir. 1987). We discern no reason to distinguish federal court judgments from their state court counterparts for these purposes, and hold that bankruptcy courts must give federal court judgments the same preclusive effect other federal courts would.

13

A party seeking to invoke collateral estoppel must establish that "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Ball*, 451 F.3d at 69 (internal quotation marks omitted).[2] The requirement that the underlying issue be "actually litigated" generally bars a court from giving a default judgment preclusive effect. *See, e.g.*, *Abrams v. Interco Inc.*, 719 F.2d 23, 33 n.9 (2d Cir. 1983) (observing that the "accepted view" is "that the decision of issues not actually litigated, e.g., a default judgment, has no preclusive effect in other litigation").

We join several other circuits in recognizing an exception to that rule: where the default judgment is entered as a sanction for bad conduct, and the party being estopped had the opportunity to participate in the underlying litigation, the default judgment has preclusive effect when determining the

---

[2] The parties agree that federal preclusion law applies. *See Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 31 (2d Cir. 2017) (noting that "implied consent is . . . sufficient to establish the applicable choice of law") (internal quotation marks omitted).

14

nondischargeability of a debt in a bankruptcy proceeding. *See, e.g., In re Corey*, 583 F.3d 1249, 1252-53 (10th Cir. 2009) (default judgment entered as sanction for misconduct during litigation given preclusive effect); *In re Docteroff*, 133 F.3d 210, 215 (3d Cir. 1997) (same); *In re Bush*, 62 F.3d 1319, 1322-25 (11th Cir. 1995) (same); *In re Daily*, 47 F.3d 365, 368–69 (9th Cir. 1995) (same).

Affording a default judgment entered as a sanction preclusive effect furthers the goal of imposing the sanction in the first instance because it deprives the sanctioned party an opportunity to relitigate an issue that could and should have been decided in the first litigation. *See, e.g., Docteroff*, 133 F.3d at 215 (not giving preclusive effect to default entered as sanction would "encourage behavior similar to [defendants] and give litigants who abuse the processes and dignity of the court an undeserved second bite at the apple"). The record here conclusively establishes that the Snyders repeatedly failed to comply with their discovery obligations in the Eastern District litigation and repeatedly failed to remedy the situation. "[T]he only reason that the first court did not have to assess the merits . . . is that the losing part[ies'] misconduct forfeited [their] right to such an assessment." *Corey*, 583 F.3d at 1253; *see also In re Bugnacki*, 439 B.R. 12,

15

24-25 (Bankr. D. Conn. 2010) (applying collateral estoppel to a default judgment when the defendant "significant[ly] participat[ed]" in the litigation, "engaged in improper litigation tactics and repeatedly failed to comply with various discovery requests," causing the default judgment to be entered as a sanction). The lower courts considered the factors relevant to determining whether collateral estoppel should be invoked, and we find no error in the analysis.

The Snyders are thus bound by the facts decided by the Eastern District and necessary to the entry of the Eastern District Judgment, including that (1) the Snyders entered, and breached, agreements with the Murphys regarding the New Jersey and Connecticut Projects; and (2) both Snyders are liable for the resulting damages.

## II.    Nondischargability

Parties filing for bankruptcy are generally entitled to a discharge "from all debts that arose before the date of the order for relief." 11 U.S.C. § 727(b). But such a "fresh start" may be granted only to "the honest but unfortunate debtor." *Grogan*, 498 U.S. at 286-87 (citing *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)). "The statutory provisions governing nondischargeability reflect a congressional

16

decision to exclude from the general policy of discharge certain categories of debts—such as child support, alimony, and certain unpaid educational loans and taxes, as well as liabilities for fraud." *Id*. at 287. "Congress evidently concluded that the creditors' interest in recovering full payment of debts in these categories outweighed the debtors' interest in a complete fresh start." *Id*.

## A.  Defalcation

As relevant here, discharge is not permitted when a debt is incurred through "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny," or through "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. §§ 523(a)(4), (6). "A creditor seeking to establish nondischargeability under § 523(a) must do so by the preponderance of the evidence." *Ball*, 451 F.3d at 69. "[E]xceptions to discharge are to be narrowly construed and genuine doubts should be resolved in favor of the debtor." *In re Hyman*, 502 F.3d 61, 66 (2d Cir. 2007).

"The question of whether a defalcation has occurred is reached only when the threshold determination that the debtor acted in a fiduciary capacity has been

17

made." *In re Hayes*, 183 F.3d 162, 170 (2d Cir. 1999). "[T]he defalcation exception is not limited to express trusts," rather, the exception applies where there is "a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendancy over the latter." *Id*. at 167 (alteration in original) (internal quotation marks omitted).

While "the precise scope of the defalcation exception is a question of federal law, its application frequently turns upon obligations attendant to relationships governed by state law." *Id.* at 166. "[S]tate law can be an important factor in determining whether someone acted in a fiduciary capacity under Section 523(a)(4)." *Id*. The first question, then, is which state's law to apply.

The lower courts here relied on New York law, reasoning that collateral estoppel bound the parties to the choice of law applied in the Eastern District litigation. *Snyder II*, 2018 WL 1914923, at *6 n.7 (affirming bankruptcy court decision to apply New York law on the ground that the Snyders waived their right to challenge the Eastern District's choice of law by not participating in that litigation). It is not clear that the choice of New York law is necessary to the Eastern District Judgment. *See In re Coudert Bros. LLP*, 673 F.3d 180, 187-88 (2d

18

Cir. 2012) (choice of law rules in bankruptcy proceedings "are more difficult to discern" than choice of law rules that apply when the court sits in diversity). However, we need not linger on the issue. Regardless of whether New York, Connecticut or New Jersey law applies, the Snyders acted as fiduciaries for the Murphys. The undisputed facts establish that the Snyders and Murphys were engaged in a joint venture with regard to both the New Jersey and Connecticut Projects. *Snyder II*, 2018 WL 1914923, at \*7-8. In New York, New Jersey, and Connecticut, joint venturers act as fiduciaries to each other. *See Doe v. Yale Univ.*, 252 Conn. 641, 674 (2000) ("The members of a joint venture undertake fiduciary duties to each other concerning matters within the scope of the joint venture.") (internal quotation marks omitted); *Silverstein v. Last*, 156 N.J. Super. 145, 152 (App. Div. 1978) ("The relation of joint adventurers, like that of co-partners, is fiduciary. . . ." (internal quotation marks omitted)); *Stem v. Warren*, 174 N.Y.S. 30 (1st Dep't 1919) ("Joint adventurers are governed by the same requirements as to good faith in their dealings with each other and with the subject-matter of the joint adventure as apply to copartnerships.").

A fiduciary relationship alone is not enough for the defalcation exception to apply. Defalcation also requires "a culpable state of mind," specifically, "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269 (2013). "Where actual knowledge of wrongdoing is lacking," this requirement is met "if the fiduciary consciously disregards (or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty." *Id.* at 274 (internal quotation marks omitted). Before declaring a debt nondischargeable, a court must find debtors engaged in "conscious misbehavior or extreme recklessness—a showing akin to the showing required for scienter in the securities law context." *Hyman*, 502 F.3d at 68. This standard "insures that the harsh sanction of non-dischargeability is reserved for those who exhibit some portion of misconduct," without "reach[ing] fiduciaries who may have failed to account for funds or property for which they were responsible only as a consequence of negligence, inadvertence or similar conduct not shown to be sufficiently culpable." *Id.* at 68-69 (internal quotation marks omitted).

In determining that the Snyders acted with the intent necessary to commit defalcation, the lower courts both found that the Snyders acted with gross recklessness in using monies intended by the Murphys for purchasing the property for the Connecticut Project on personal expenses. *Snyder I*, 2017 WL 1839122, at *9-10; *Snyder II*, 2018 WL 1914923, at *9. On appeal, the Snyders argue that the lower courts erred by relying only on the Snyders' actions in relation to the Connecticut Project in finding the intent necessary for defalcation with regard to the New Jersey Project. We agree.

In analyzing this issue, the district court concluded that it must consider the Eastern District Judgment as a whole because the debt could not be fairly divided "to distinguish losses that solely arose from the Snyders' breach of fiduciary duty from those that simultaneously arose from the Snyders' concomitant breach of contract." *Snyder II*, 2018 WL 1914923, at *12. However, the district court failed to consider whether the debt could be fairly parsed so as to consider the debt associated with the New Jersey Project separately from the debt associated with the Connecticut Project. The district court relied on *Cohen v. de la Cruz*, 523 U.S. 213 (1998), for the proposition that the Eastern District

21

Judgment was not divisible. There, Edward Cohen, a landlord, was ordered by the state to refund roughly $30,000 in excess rent collections to his tenants. *Id.* at 215. Cohen filed for bankruptcy, and his tenants filed an adversary proceeding to have the debt declared nondischargeable as the fruits of "actual fraud" pursuant to 11 U.S.C. § 523(a)(2)(A). *Id.* (internal quotation marks omitted). The tenants also sought treble damages and attorneys' fees and costs under New Jersey's consumer fraud statute. *Id.* The bankruptcy court found in the tenants' favor, declaring the $30,000 refund obligation nondischargeable and awarding about $90,000 in statutory treble damages, along with attorneys' fees and costs. *Id.* at 215-16. The question before the Supreme Court was whether nondischargeability under Section 523(a)(2)(A) extends only to the value of what the debtor gained through fraud, or to "all liability arising from fraud," including statutory treble damages. *Id.* at 215. The Court held that nondischargeability extends to all liability arising from the fraud, which in *Cohen* included the treble damages. *Id.* at 218 ("Once it is established that specific money or property has been obtained by fraud, . . . any debt arising therefrom is excepted from discharge."(internal quotation marks omitted)).

However, nothing in *Cohen* bars a court from determining whether only a portion of a contested debt "arose from" the amounts obtained through defalcation, and thus is nondischargeable. *See, e.g., In re Munoz*, 592 B.R. 736, 744-45 (D. Colo. 2018) (affirming bankruptcy court decision to separately consider the nondischargeability of each portion of the judgment), *appeal docketed*, No. 18-1395 (10th Cir. Oct. 3, 2018). The proper inquiry here required the court to examine whether the Snyders committed defalcation with regard to the monies involved in the New Jersey and Connecticut Projects separately, not with regard to the debt as a whole. Under different factual circumstances, the portions of a contested debt may be so intertwined as to make division infeasible—indeed, the district court may be correct that it would be nearly impossible to tease out those portions of the debt flowing from breach of contract and those from breach of a fiduciary duty—but that is not the analysis at issue here. The Eastern District Judgment allocated damages for the New Jersey and Connecticut Projects separately, including separate interest awards, making the two debts easily parsed.

23

The defalcation exception requires a court to determine if a "fiduciary consciously disregard[ed] (or [was] willfully blind to) a substantial and unjustifiable risk that his conduct [would] turn out to violate a fiduciary duty." *Bullock*, 569 U.S. at 273-74 (internal quotation marks omitted). In that regard, the New Jersey and Connecticut Projects stand on different footing. With regard to the New Jersey Project, the undisputed evidence is that the Murphys wired their funds to an attorney trust account that the Snyders allege was controlled by Maisel's attorney. Stuart Snyder stated that Maisel told him the funds were used to buy the property for the New Jersey Project, and that Stuart Snyder "never received, nor had possession of or controlled this investment of $100,000." App'x at 320. The Murphys do not point to evidence in the record to dispute this contention. In finding the Snyders defalcated the funds for the New Jersey Project, the district court noted that "[t]here is not the same evidence of deliberate malfeasance" with regard to the New Jersey Project as there is for the Connecticut Project. *Snyder II*, 2018 WL 1914923, at *9 n.11. The district court found it dispositive that the Eastern District concluded "that the Snyders—not Maisel—were liable for breaching" the oral agreement. *Id*. But breaching a

24

contract, without more, does not demonstrate the mens rea necessary to prove defalcation. Defalcation requires proof of "conscious misbehavior or recklessness," which "insures that the harsh sanction of non-dischargeability is reserved for those who exhibit some portion of misconduct." *Hyman*, 502 F.3d at 68-69 (internal quotation marks omitted). We conclude that the Snyders raise a triable issue of fact as to whether a defalcation occurred as to the New Jersey Project.

There is, however, ample evidence in the record to support the finding of defalcation with regard to the Connecticut Project. The Murphys wire transferred the funds to a bank account controlled by BBSea with the expectation that they would be used to purchase the property for the Connecticut Project. Instead, that money was used "for other projects and purposes without notice to or authorization by the" Murphys. App'x at 127. When the Murphys transferred the funds on August 28, 2006, there was only $804.86 in the BBSea account. By October 17, 2006, the BBSea account contained only $3,875.81—with no deposits of any significance made during that time. Stuart Snyder admitted that he spent some of the investment on "personal expenses" and that he used his "business

accounts at that time to pay [his] personal as well as business expenses." App'x at 324. The property for the Connecticut Project was never purchased.

The Snyders argue that at least some portion of the debt associated with the Connecticut Project is dischargeable because the bulk of the funds were used for the New Jersey Project at Joseph Murphy's direction. The Snyders are collaterally estopped from making that argument. The Eastern District specifically found that the monies transferred by the Murphys for the Connecticut Project were used "for other projects and purposes without notice to or authorization by the" Murphys. App'x at 127. The Snyders are bound by that finding. The damages and interest awarded in the Eastern District Judgment for the breach of contract regarding the Connecticut Project are nondischargeable.

B.    **"Willful and malicious injury"**

"Section 523(a)(6) of the Bankruptcy Code provides that a debt 'for willful and malicious injury by the debtor to another' is not dischargeable." *Kawaauhau v. Geiger*, 523 U.S. 57, 59 (1998). The plaintiff must demonstrate "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Id.* at 61 (emphasis omitted). In addition, "[t]he injury caused by the debtor must

26

also be malicious, meaning 'wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will.'" *Ball*, 451 F.3d at 69 (citation omitted). "Malice may be implied by the acts and conduct of the debtor in the context of the surrounding circumstances," *id*. (internal quotation marks and alteration omitted), and "will be found where the debtor has breached a duty to the plaintiff founded in contract, statute or tort law, willfully in the sense of acting with deliberate intent, in circumstances where it is evident that the conduct will cause injury to the plaintiff and under some aggravating circumstance," *In re Hambley*, 329 B.R. 382, 402 (Bankr. E.D.N.Y. 2005) (internal quotation marks omitted).

The analysis underlying our decision on the defalcation claim applies equally here, and we find that the Snyders raise a triable question of fact as to whether the debt associated with the New Jersey Project is nondischargeable pursuant to Section 523(a)(6). As we affirm the finding of defalcation with regard to the debt associated with the Connecticut Project, we need not address whether that debt is also nondischargeable pursuant to Section 523(a)(6).

**CONCLUSION**

For the reasons given above, we vacate the finding of nondischargeability as to the part of the debt associated with the New Jersey Project and remand for further proceedings consistent with this opinion. We affirm the finding of nondischargeability as to the debt associated with the Connecticut Project. As the district court did not reach the parties' arguments regarding embezzlement, we decline to do so here, without prejudice to the parties renewing their arguments below.

After this appeal was perfected and argument heard, the Snyders' attorney, Scott Charmoy, moved to withdraw from further representation of the Snyders before this Court. That motion is hereby granted.